THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
M. C. HARRIS, a/k/a Michael C. Harris, Defendant-Appellant.

First District (1st Division)   Nos. 76-75, 76-832 cons.

Opinion filed October 11, 1977.

Jerome Feldman, of Chicago (Judith A. Halprin, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Winifred H. Date, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

M. C. Harris was indicted on August 7, 1973, for the offenses of attempt murder, aggravated battery and battery. On September 27, 1973, he was indicted for rape, indecent liberties with a child, and contributing to the sexual delinquency of a child. In separate trials before the same judge of the circuit court of Cook County sitting without a jury, the defendant was convicted of rape and sentenced to from four to six years imprisonment, and convicted of attempt murder and sentenced to from five to 15 years imprisonment. The sentences were ordered to run concurrently. Defendant has appealed from both convictions, and the appeals have been consolidated due to common questions of fact and law.

Defendant has presented 17 issues for review, but in light of our disposition of these appeals we shall consider only the issue of whether the trial court properly found that defendant was fit to stand trial and to be sentenced.

The question of defendant's fitness was first raised by defense counsel prior to the commencement of the first trial. The State had elected to proceed first on the sex offenses. Defense counsel told the court that he had recommended to defendant that a jury be waived. The court questioned the defendant concerning his understanding of the effect of a jury waiver, and the defendant stated he wanted a jury. There was a recess at which time defendant conferred with his lawyer and following which the court again inquired of defendant whether he wished to waive a jury. Defendant stated that he wanted a jury. Defense counsel then related to the court that his client, for the first time in the year he had been engaged to represent him, was not cooperating with him and refused to communicate. Defense counsel stated that he thought a psychiatric examination of defendant "might be in order." Another recess was had while defendant conferred with his mother. The court inquired further of defendant on the question of whether he would voluntarily and understandingly waive a jury, and defendant stated he wanted a bench trial. However, when the jury waiver form was presented to defendant for his signature, he would not sign it. The assistant State's attorney commented, "It doesn't appear that he understands the meaning of the paper. I don't think he knows." After further questioning and explanation by the court, the defendant did sign the form. The trial then began, with no further pursuit by defense counsel or the court of the matter of defendant's fitness to stand trial.

The State presented evidence. Before the State rested, defense counsel petitioned the court to conduct a fitness hearing pursuant to section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1), alleging in the petition that he had just been made aware from the defendant's school records that defendant was mentally retarded. The court granted the petition and suspended the trial for psychiatric examination of the defendant and the fitness hearing.

At the hearing, the defense called as a witness a psychiatrist, the assistant director of the Psychiatric Institute of the Circuit Court of Cook County. The doctor testified that, based on his examination of defendant pursuant to order of court, and based on the report of a psychologist from the Institute who had tested defendant and on defendant's school records, in his opinion the defendant was not fit to stand trial; because of a mental condition the defendant was unable to cooperate with counsel and assist counsel in his own defense. On cross-examination, the doctor testified that he believed the defendant understood the nature of the charge against him, but he doubted whether defendant fully understood the nature of the proceedings, *i.e.*, the trial. The doctor diagnosed the defendant as mentally defective, and also diagnosed him as psychotic and suffering from the disease of paranoid schizophrenia, characterized by delusions of

hearing voices telling him to do things the opposite of what he wanted to do, and other hallucinations. The doctor admitted that the defendant's responses could have been produced by the defendant's malingering, but his professional opinion was that the defendant was not intelligent enough to malinger. On redirect, it was established that successive intelligence tests administered to defendant revealed intelligence quotients (I.Q.'s) of 57 in May 1966, 59 in January 1967, 63 in March 1967, and 55 in April 1974. On recross, the doctor testified that in his opinion a person with an I.Q. below 60 is never able to be found fit to stand trial because he would not be intelligent enough.

The State called the psychiatrist who was director of the Psychiatric Institute and, therefore, the first doctor's administrative superior. The State's witness examined the defendant twice after reading the report of the first doctor. He found the defendant to be evasive and uncooperative until questioned sharply, and found no evidence of delusions or hallucinations that could not be explained. In his professional opinion, the defendant understood the nature of the charges and the judicial process and was mentally capable of cooperating with his counsel, but may have been choosing to be uncooperative with counsel. This doctor found no evidence of psychosis and classified defendant's mental retardation as "mild." On cross-examination, the doctor gave his opinion that the defendant was malingering when tested by the first psychiatrist and the Institute's psychologist, and also when he was tested in January of 1967 at school, which test revealed that defendant read, spelled and comprehended at a first grade level at the age of 14. The doctor testified that the first psychiatrist was definitely competent, and that if the first psychiatrist testified that defendant was unfit, they would be in "professional disagreement."

Both the psychologist from the Institute and a psychologist from the Chicago Board of Education testified for the defense that they had had experience with malingerers, and in their opinions defendant was not malingering when given the tests which revealed the I.Q. scores set forth above.

The defense called a third psychiatrist, employed as the psychiatric advisor to the Illinois Parole and Pardon Board of the Illinois Department of Corrections. Based on his interview and examination of defendant, it was his opinion that defendant was unfit to stand trial because he could not cooperate with counsel. On cross-examination, the doctor diagnosed defendant as mentally retarded and gave his opinion, based on his experience, that defendant was not a malingerer but rather was uncooperative and withdrawn rather than negativistic. Defendant could add, but was not accurate in subtraction and was completely unable to respond to multiplication problems such as "six times seven." He could

spell "cat" correctly, but could not spell "tiger" correctly. The doctor's opinion was that defendant had poor insight and judgment but was not suffering from a psychosis.

After hearing this evidence and after argument, the court concluded that the defendant was mentally retarded, but notwithstanding this fact could understand the nature of the charges and could cooperate with his counsel, "since he could cooperate with the doctors," acknowledging that there was disagreement on that issue as well. The defendant having been found fit to stand trial, the trial continued and the defendant was found guilty of rape at its conclusion.

At the beginning of the trial on the second indictment, a colloquy took place between the defendant, the court and counsel concerning the jury waiver which closely resembled the occurrence during the first trial. The same trial judge again questioned the defendant as to his desire to be tried by a jury or by the court. Defendant first asked for a trial by a jury, then by the court, then by a jury again. A different assistant State's attorney at that point commented, "Judge, I don't really think the defendant understands what he is doing, what he is saying." After a short conference with his mother and family, the defendant chose a trial by the court and signed a jury waiver form. The trial on this indictment proceeded and defendant was found guilty of attempt murder at its conclusion.

■■ Defendant was ruled fit to stand trial by the court on November 1, 1974. At that time the burden of proof was thought to be governed by section 5—2—1 of the Unified Code of Corrections effective January 1, 1973, which placed the burden of proof of unfitness on the defendant if the defendant raised the issue. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1(i).) However, the Supreme Court has held that section 5—2—1(i) is unconstitutional to the extent that it placed on the defendant the ultimate burden of proving his own unfitness in *People v. McCullum* (1977), 66 Ill. 2d 306, 314, 362 N.E.2d 307, 311. The burden therefore is on the State to establish by a preponderance of the evidence that defendant was fit to stand trial. 66 Ill. 2d 306, 313, 362 N.E.2d 307, 310.

It cannot be determined from the record whether the trial court considered the burden of proof to be on the State or on the defendant. If the court had placed the burden on the defendant to prove his unfitness, the judgment must be reversed. (*People v. Thompson* (1967), 36 Ill. 2d 332, 334-35, 223 N.E.2d 97, 98.) "In the absence of any indication to the contrary, we must assume that the trial judge, in allocating the burden of proof on fitness, followed the clear direction of section 5—2—1(i). * * * Moreover, our assumption is confirmed by the fact that the trial court, in conducting the fitness hearing, made the defendant proceed first, both in offering evidence and in making arguments." *People v. Hubert* (1977), 51 Ill. App. 3d 394, 398-99.

■■ In *Hubert*, we reversed and remanded for a new trial on the condition that the defendant be found fit for trial. We follow the same course here. In addition, because all the experts called to testify were employees of the State or one of its subdivisions, we direct the trial court on remand to appoint one or two independent psychiatrists to examine the defendant and to testify concerning the defendant's fitness to stand trial and to be sentenced, and also as to his sanity at the time of the offenses.

In view of our above conclusions it will not be necessary to consider the remaining contentions of defendant. *People v. Hubert; People v. Lang* (1975), 26 Ill. App. 3d 648, 655, 325 N.E.2d 305, 310.

The convictions of defendant for rape and attempt murder are reversed and the cases are remanded to the circuit court of Cook County for proceedings consistent with the views expressed herein.

Reversed and remanded with directions.

GOLDBERG, P. J., and McGLOON, J., concur.